Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| R.R., and S.R., <br><br>               Plaintiffs, <br><br> vs. <br><br> UNITED HEALTHCARE INSURANCE COMPANY, UNITED BEHAVIORAL HEALTH, GENERAL DYNAMICS CORPORATION, and the GENERAL DYNAMICS CORPORATION UHC SELECT HSA PLAN. <br><br>           Defendants. | AMENDED COMPLAINT <br><br> Civil No. 2:21-cv-00687 - DBB <br><br> Judge David Barlow |

Plaintiffs R.R. and S.R., through their undersigned counsel, complain and allege against

Defendants United Healthcare Insurance Company, United Behavioral Health (collectively

"United"), the General Dynamics Corporation, and the General Dynamics Corporation UHC

Select HSA Plan ("the Plan") as follows:

//

//

## PARTIES, JURISDICTION AND VENUE

1. R.R. and S.R. are natural persons residing in New London County, Connecticut. R.R. is S.R.'s father.

2. United is an insurance company headquartered in Hennepin County, Minnesota and was the third party administrator, as well as the fiduciary under ERISA, for the Plan during the treatment at issue in this case.

3. United Healthcare Insurance Company handled medical or surgical claims on behalf of the Plan, and its subsidiary and affiliate United Behavioral Health handled mental health claims on behalf of the Plan and United Healthcare Insurance Company. United also operates under the brand name Optum.

4. General Dynamics is an aerospace and defense corporation and was the Plan Administrator during the time period at issue. At all relevant times United acted as agent of General Dynamics.

5. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). R.R. was a participant in the Plan and S.R. was a beneficiary of the Plan at all relevant times. R.R. and S.R. continue to be participant in and beneficiary of, respectively, the Plan.

6. S.R. received medical care and treatment at True North Wilderness Program ("True North") from January 14, 2020, to April 1, 2020, and Ascend Recovery ("Ascend") from May 18, 2020, to July 19, 2020. S.R. then received partial hospitalization and intensive outpatient treatment at Ascend from July 20, 2020, through December 29, 2020.

7. These are licensed treatment facilities and programs which provide sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse

problems. True North is located in Washington County, Vermont and Ascend is located in Utah County, Utah.

8. United denied claims for payment of S.R.'s medical expenses in connection with his treatment at True North and Ascend.

9. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

10. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because United does business in Utah, and a significant portion of the treatment at issue took place in Utah. In addition, venue in Utah will save the Plaintiffs costs in litigating this case. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

11. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), for an award of statutory damages against General Dynamics pursuant to 29 U.S.C. §1132(c) based on the failure of the agents of General Dynamics, the Plan administrator, to produce within 30 days documents under which the Plan was established or operated, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

//

//

## BACKGROUND FACTS

### S.R.'s Developmental History and Medical Background

12. Around the time that S.R. was in kindergarten he was diagnosed with a tick-borne illness which caused him to suffer from a variety of physical conditions such as fevers, headaches, rashes, hives, vomiting, and headaches.

13. S.R.'s headaches continued as he grew older. He struggled with school but was able to do well with the help of tutors and a 504 education plan. S.R. enjoyed playing sports, particularly soccer.

14. In 2017 or 2018, S.R. became increasingly unhappy, he quit soccer, and spent most of his time around new friends that he would use drugs with. S.R. also self-harmed at times by doing things like ripping off a toenail.

15. S.R. began outpatient therapy. This was initially somewhat effective, but S.R.'s drug abuse worsened shortly over time. He started using substances on a near daily basis and also started experimenting with new substances like Xanax and LSD.

16. In December of 2019, S.R. was suspended from school for ten days after getting high on campus and being caught with drug paraphernalia. S.R. then took even more drugs and stated that he had nothing to live for. S.R. was then taken to the hospital after which he was admitted to True North.

### True North

17. S.R. was admitted to True North on January 14, 2020.

18. In a letter dated January 23, 2020, United denied payment for S.R.'s treatment at True North. The reviewer gave the following justification for the denial:

> Your child was admitted for treatment of depression. It is noted that his condition does not be [sic] guidelines for coverage of treatment in this setting. There are no medical issues. He is not a danger to self or others. He is active in his treatment. Family is supportive. In addition, wilderness therapy is considered an unproven treatment. Care could continue in the mental health partial hospitalization setting.

19. On July 7, 2020, R.R. submitted a level one appeal of the denial of payment for S.R.'s treatment. R.R. reminded United that he was entitled to certain protections under ERISA including a full, fair, and thorough review using appropriately qualified reviewers, which took into account all of the information he provided, gave him the specific reasoning for the determination, referenced the specific plan provision on which the decision was based, and gave him the information necessary to perfect the claim.

20. In addition, R.R. requested to be provided with a copy of "any and all documentation" related to the appeal determination, including the reviewer's notes. R.R. also reminded United that it was required to act in his best interest.

21. R.R. disputed United's assertion that wilderness therapy was unproven. He stated that numerous studies had shown its effectiveness, some of which he included with the appeal. R.R. included the contact information for Dr. Michael Gass, an expert in the field, and asked United to contact him.

22. R.R. alleged that the guidelines used by United were flawed and violated generally accepted standards of medical care. He cited to the court decision in *Wit et.al., v. United Behavioral Health* in which the court had found United's guidelines to violate generally accepted standards on multiple counts.

23. R.R. pointed out that United was evaluating the medical necessity of S.R.'s treatment using the same guidelines which the *Wit* court had found to be impermissible. He pointed

out that after the *Wit* decision United had retired these guidelines, however it was still using them to evaluate S.R.'s treatment.

24. R.R. argued that S.R. needed to be removed from his home environment in order to be effectively treated. R.R. wrote that it was the opinion of S.R.'s treatment providers that he required the treatment he was receiving at True North.

25. In a letter dated May 11, 2020, Brian Fay, LCSW, wrote in part:

> As [S.R.] has consistently resisted the idea of a structured dual-diagnosis program, and he was not yet acute enough to warrant an involuntary psychiatric hospitalization, a wilderness treatment that would remove [S.R.] from his environment and keep him safe while securing intensive treatment was warranted. [S.R.] was clearly not responding to increased levels of community health care and was a danger to himself as evidenced by his recent very serious incident of poly-substance intoxication in his school setting necessitating him being brought to the Emergency Department.
>
> In closing, I would like to emphasize that efforts to encourage [S.R.] to utilize a lower level of care (IOP) had been suggested and refused on multiple occasions. To have made efforts to force this level of care would have likely escalated [S.R.]'s distress and he shouldn't have to fail in a lower level of care prior to providing him a higher level of care - especially when he was provided a higher level of care after becoming a danger to himself.

Nicholas Condulis, M.D., FAAP, wrote in part in a letter dated May 29, 2020:

> [S.R.] (DOB [redacted]) is a patient in our practice and is very well known to me since birth. This letter is to fully support this intensive intervention that [S.R.] has received and will continue to need for his Cannabis Use Disorder. I have followed him for depression for over a year while he was seeing his current therapist of several years. The medical management seemed to help his mood initially but did not curtail it fully. As time progressed [S.R.] used marijuana in increasing fashion and became heavily dependent on it. He also has begun abusing benzodiazepines and LSD, resulting in an emergency room visit and overnight psychiatric evaluation in December, 2019.
>
> I fully support the decision for [S.R.]'s extensive treatment through True North Wilderness Program for the needed residential care that was required. [S.R.]'s drug use had diversified and escalated, and despite continued outpatient treatment a more aggressive approach was required.

26. R.R. wrote that S.R.'s treatment at True North was essential to provide him with the coping skills necessary to overcome his chronic issues and bring meaningful change into his life.

27. R.R. reminded United that it was prohibited under MHPAEA from imposing limitations on mental health treatment which were not equally applied to analogous levels of skilled nursing care.

28. R.R. referenced *Johnathan Z. v. Oxford Health Plans* in which the court found skilled nursing and subacute rehabilitation programs to be the proper analogues for wilderness treatment.

29. He asked in the event that United upheld the denial that it provide him with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, a copy of any clinical guidelines or medical necessity criteria utilized in the determination, as well as their medical and surgical equivalents, and any reports or opinions from any physician or other professional concerning the claim. (collectively the "Plan Documents")

30. R.R. asked if United was not in possession of the Plan Documents or was not acting on behalf of the Plan Administrator in this regard, that it forward his request to the appropriate entity.

31. In a letter dated August 12, 2020, United upheld the denial of payment for S.R.'s treatment. The reviewer wrote in pertinent part:

> Criteria were not met due to:
>
> - You had problems with sadness.
> - You had difficulty with substance use.

- These difficulties could have been managed at a lower level of care.
- You did not have medical problems that needed this level of care.
- Wilderness Therapy is not proven treatment for your conditions.

Instead, care could have taken place in the Mental Health Partial Hospital Program setting with substance use counseling.

32. On October 19, 2020, R.R. submitted a level two appeal of the denial of S.R.'s treatment. R.R. wrote that S.R.'s treatment was a covered benefit under the terms of the Plan and was not unproven. He stated that True North was licensed by the State of Vermont as a residential treatment program and was operated in accordance with Vermont state regulations. R.R. attached a copy of True North's license to the appeal.

33. He asked how United could classify True North as experimental or unproven when it was clearly licensed by the appropriate state regulatory agency as a residential treatment facility. He termed this as a "clear effort to misclassify the level of care that my son received in order to avoid paying his claims."

34. R.R. questioned the validity of the criteria utilized to evaluate S.R.'s treatment. He pointed out that these criteria equated wilderness treatment with "some kind of scouting camp, boot camp, or summer adventure camp." He reiterated that True North was a licensed clinical program which provided evidence-based therapeutic interventions and argued that it was disingenuous to equate it to a non-therapeutic adventure camp with the primary purpose of entertaining children.

35. R.R. included a letter to this effect from Dr. Michael Gass which identified the benefits of wilderness therapy and stated that United's criteria not only misrepresented what went on in the wilderness environment, but also misrepresented the current available literature regarding the effectiveness of this level of care.

36. R.R. also pointed out that United's criteria were superseded by the actual terms of the insurance policy and accused United of acting arbitrarily as it did not define what constituted a proven or unproven treatment in the insurance policy.

37. R.R. contended that United had failed to abide by its responsibilities under ERISA on multiple counts; It had not meaningfully addressed any of the arguments he had raised, including his concern that its denials were in violation of MHPAEA and its reviewer did not have a specialization in child and adolescent psychiatry or training on MHPAEA compliance and was therefore, according to R.R., not qualified to conduct the review.

38. R.R. reiterated that under MHPAEA, United could not impose restrictions on the behavioral health benefits S.R. received which were stricter than those applied to its medical or surgical analogues such as skilled nursing, rehabilitation, or hospice facilities.

39.  R.R. wrote that United was imposing non-quantitative treatment limitations on behavioral health providers based on facility type and provider specialty which it did not equally apply to analogous medical or surgical providers.

40. R.R. requested that United perform a parity compliance analysis on the Plan to assess its MHPAEA compliance and to provide him with a physical copy of the results of this analysis as well as any documentation used.

41. R.R. stated that not only was S.R.'s treatment a covered benefit under the terms of the Plan, but it was also a medically necessary course of action.

42. R.R. again asked to be provided with a copy of the Plan Documents and asked United to inform him why federal law and the terms and conditions of the Plan appeared not to apply to S.R.'s treatment.

43. In a letter dated November 24, 2020, United upheld the denial of payment for S.R.'s

treatment. The letter stated in part:

> You were admitted to a wilderness program. After reviewing the supplied appeal
> information, medical records were not provided for each appealed date of service.
> Therefore, there was insufficient clinical information to support the medical
> necessity for treatment in a mental health residential setting. In addition, there was
> no information that you met initially or at regular intervals with a facility
> psychiatrist, which is an expectation at this level of care.
>
> Furthermore, the Optum behavioral clinical policy on wilderness therapy
> considers it unproven and not medically necessary for the treatment of emotional,
> addiction, and/or psychological problems.

44. On December 23, 2020, R.R. requested that the denial of S.R.'s treatment be evaluated by

an external review agency. He argued that United's arguments concerning the

experimental nature of wilderness were disproven in his appeals. He also contended that

United's contention that it did not possess sufficient clinical information was likewise

unfounded as he had included this information in his appeals as well. He asked the

reviewer to base their decision on the information he had provided, including the

arguments he had made in his prior appeals

45. In a letter dated February 15, 2021, the external review agency upheld the denial of

S.R.'s treatment. The reviewer wrote in part:

> The patient was referred to a residential wilderness/outdoor behavior therapy
> program for complaints of depression and substance abuse. He had been
> suspended in school for abusing benzodiazepines, LSD, and cannabis. The patient
> had a history of depression and substance abuse and was treated at the outpatient
> level of care previously by a therapist and doctor. He was prescribed fluoxetine. It
> was recommended for him to attend intensive outpatient program, [sic] but
> refused to do so. [sic] He was eventually referred to the wilderness program in
> January 2020 after he was taken to the emergency room in December 2019 for
> acute intoxication on benzodiazepine and cannabis.
>
> The clinical documents available include a case management note from the
> patient's therapist during the wilderness/outdoor behavior therapy program. The

notes contain details about the claimant's participation in the program as well as his resistance to certain elements of the program.

There is no documentation of any severe psychiatric symptoms. There is no documentation of any withdrawal symptoms. There is no documentation of any medical symptoms. There is no documentation of any medication treatment. There is no documentation of any medication withdrawal. There is no documentation of 24 hour nursing and medical supervision such as daily vital signs assessment, physical examinations, standardized scales to assess psychiatric symptoms, standardized scales to assess withdrawal symptoms. These are all elements that are expected to be present in medical documents supporting 24 hour medical and nursing supervision at the residential level of care.

Furthermore, the residential/wilderness/outdoor behavior therapy notes did not contain any psychiatric examination notes or psychiatric consultation notes. These are also documents that would be expected in a medical file which supported residential treatment. The patient could have been managed at a less restrictive level of care such as a substance abuse or dual diagnosis intensive outpatient program.

Therefore, based on the submitted records, current medical literature, and societal guidelines, the Mental Health Services, Residential Level of Care on 1/14/2020 - 4/1/2020, are not unproven. However, they are not supported as medically necessary in this case.

### Ascend

46. Following S.R.'s discharge from True North, he began attending an intensive outpatient program called Project Courage. S.R. quickly relapsed and was admitted to Ascend on May 18, 2020, with United's approval.

47. In a letter dated July 2, 2020, United denied further payment for S.R.'s treatment at Ascend from June 26, 2020, forward. The letter gave the following justification for the denial:

You were admitted for substance use treatment.

Using the American Society of Addiction Medicine Criteria: Treatment Criteria for Addictive, Substance-Related, and Co-Occurring Conditions, Third Edition (The ASAM Criteria), we reviewed a request to begin benefit coverage at

American Society of Addiction Medicine 3.5 Clinical Managed High Intensity Residential Level of Care effective 6/26/2020 and forward.

We spoke with your provider and reviewed your clinical records.

The criteria are no longer met because:
- You have made good progress and your condition no longer requires 24 hour Residential Treatment care.
- You are cooperative and doing better.
- You are motivated for recovery and change.
- You remain sober.
- You have no withdrawal symptoms.
- You are physically stable.
- You are taking medicine as prescribed.
- You are doing your daily activities.
- You are not reporting any unsafe thoughts.
- You are in emotional and behavioral control.
- You are actively engaged in programming.
- You family [sic] is involved and supportive.
- You are learning and actively using sober coping and relapse prevention skills.
- You have a safe, sober and supportive place to live.

Based on The American Society of Addiction Medicine Criteria, it is my determination that no further authorization can be provided for the American Society of Addiction Medicine 3.5 Clinical Managed High Intensity Residential Level of Care effective 6/26/2020 and forward.

Instead, you could continue care at the American Society of Addiction Medicine 2.5 Partial Hospitalization/Day Treatment Program Level of Care with sober living and community supports.

48. In addition, United sent the Plaintiffs a letter dated July 6, 2020, which gave the

following justification for the denial:

We've denied the medical services/items listed below requested by you or your provider: ASAM 3.5 Clinical Managed High Intensive Residential Level of Care as of June 26, 2020.You are being treated for marijuana, Xanax, and other substance use. Your request was reviewed. We have denied the medical services requested because. [sic] We talked to your provider. The criteria are not met because: There are no severe withdrawal symptoms that need treatment in this setting. You are medically stable. You do not have severe mental health issues that keep you from having treatment in a less intensive setting. You are not reporting any unsafe thoughts. You are learning about substance use, relapse prevention and the use of community sober supports. You are motivated for

change. You could consider taking medication for alcohol cravings. You are participating in treatment and recovery programming. You have sober supports in the community. Care and recovery could continue in the ASAM 2.5 Partial Hospitalization/Day Treatment Program level of care.

49. On August 31, 2020, R.R. appealed the denial of payment for S.R.'s treatment at Ascend. R.R. documented the factors which led to S.R.'s admission and stated that in spite of all of the interventions at the outpatient level, S.R. continued using substances after his discharge from True North and his home environment was no longer safe.

50. R.R. stated that S.R. had a dual diagnosis of substance use disorder and mental health conditions, but it did not appear that United had taken S.R.'s Major Depressive Disorder into account when it denied payment.

51. R.R. agreed that S.R. had made progress while in treatment and was doing better, but he argued that a premature discharge would have undermined this success. He asked United what evidence it possessed which caused it to determine that treatment was no longer necessary. He accused United of relying on anecdotal evidence and "vague examples with no basis" to justify its determination to deny payment.

52. R.R. pointed out that S.R. was over the age of eighteen and could have left treatment at any point but chose to stay based on the recommendations of his treatment team.

53. R.R. wrote that it was appropriate to continue treatment when a patient made progress towards their goals and it was reasonable to believe that they would continue making progress. He contended that a premature discharge would have prevented S.R. from continuing to make progress.

54. In a letter dated October 15, 2020, United stated that following a complaint from the Plaintiffs, it had reached out to Ascend and "educated [them] on UBH's billing

expectations and their contractual obligations to not collect money upfront other than the
applicable copayments."

55. In a letter dated December 3, 2020, United again denied payment for S.R.'s treatment at
Ascend. The reviewer gave the following justification for the denial:

> As requested, I have completed an appeal/grievance review on a request we
> received 11/25/2020. This review included an examination of the following
> information: Internal Case Records, Medical Records and Your Letter of Appeal.
> After fully investigating the substance of the appeal/grievance, including all
> aspects of clinical care involved in this treatment episode I have determined that
> benefit coverage is not available for the following reason(s):
>
> Taking into consideration all the above information, it is my opinion that the
> requested service did not meet American Society of Addiction Medicine (ASAM)
> Guidelines for substance abuse residential treatment. The patient was medically
> stable. There were no safety concerns. No major behavioral issues. He was
> medically stable, abstinent and not in risk [sic] for withdrawal symptoms. He was
> compliant with medications and his depression and anxiety were stabilizing. He
> was motivated to learn new skills to manage sobriety. His home environment was
> sober and supportive. Treatment at a lower level of care appears appropriate.

56. On February 10, 2021, R.R. requested that the denial of payment for S.R.'s treatment be
evaluated by an external review agency. He contended that United had not taken S.R.'s
treatment history into account and had made the decision to deny without consulting the
treatment team that had met with S.R. in person. R.R. also pointed out that United had
previously paid for portions of S.R.'s treatment at Ascend.

57. He wrote that S.R. had been diagnosed with cannabis use disorder (severe), alcohol use
disorder (severe), sedative, hypnotic, or anxiolytic use disorder (severe), opioid use
disorder (moderate), major depressive recurrent episode (severe) and generalized anxiety
disorder.

58. R.R. included excepts from S.R.'s medical records with the appeal. These records
showed that S.R. presented a high risk of relapse, was emotionally volatile, made very

gradual progress, and struggled with impulsivity, depression, and anxiety while in treatment. R.R. also reminded United of its obligations under MHPAEA.

59. R.R. contended that S.R. was only abstinent at Ascend because he was in a treatment program under supervision. He argued that if S.R. had been discharged prematurely S.R.'s progress would have been jeopardized, especially given his history of relapses at a lower level of care. R.R. wrote that S.R. continued to meet the Plan's criteria for residential treatment care, and United had provided no examples as to why treatment was no longer necessary or why it felt he was ready to be discharged.

60. R.R. included new letters of medical necessity with the appeal. In an undated letter Susan Wiet, MD wrote in part:

> Throughout his treatment, Mr. [R.] continued to make important and very significant strides toward recovery. He addressed core therapeutic issues that would not have been able to be addressed in a succinct and holistic manner in a lower level of care. Had he not been at a residential level during this critical window of timing for orchestrated treatment, I am quite certain that his ability to progress would have been thwarted and gains in treatment would have resulted in a poor outcome. Because of the excellent clinical skill set of the treatment team at Ascend and judgement of client-readiness. Mr [R.] has continued to thrive and is now progressing favorably in recovery at lower levels of care.

S.R.'s therapist at Ascend, Hargrove Bowles, LCSW, wrote in part in an undated letter:

> While I agree that [S.R.] made positive gains while in residential treatment, those gains were not given enough time to be properly internalized to become sustainable. In hindsight in light of his most recent relapse, he should have stayed in residential longer to solidify those gains. His compliance and stated desires to remain in recovery were situational at best, and the most effective way to move patients into an action stage of change is an environment of structured support that best meets their needs. [S.R.]'s depression remains a concern as he is quick to fall into despondency, become impulsive, and has little to no defense against temptation at the present time, much less during the time frame for your denial of coverage. …
>
> [S.R.]'s goal here was not met as indicated above regarding his relapse. Quite simply, he was not able to internalize the coping skills necessary to maintain recovery outside of a structured environment on his own.

61. On March 30, 2021, R.R. supplemented the appeal with additional medical records.

62. In a letter dated April 05, 2021, external review agency Dane Street upheld the denial of

    payment for S.R.'s treatment. The reviewer appears to have focused almost exclusively

    on S.R.'s alcohol use and no indication is given as to whether S.R.'s other substance use

    or mental health conditions factored into the decision to deny payment. The reviewer

    gave the following justification for the denial of payment:

    > This is a 19-year-old member with a diagnosis of F10.20 Alcohol use disorder.
    > The request is for the coverage of Substance Use Disorder Services.

    > Decision: Deny

    > The request was previously denied stating that as requested, the member has
    > completed an appeal/grievance review on a request received 11/25/2020. This
    > review included an examination of the following information: Internal Case
    > Records, Medical Records, and member Letter of Appeal. The member was
    > medically stable. There were no safety issues. No major behavioral issues. The
    > member was medically stable, abstinent, and not at risk for withdrawal symptoms.
    > The member was compliant with medications and depression and anxiety were
    > stabilizing. The member was motivated to learn new skills to manage sobriety.
    > The member's home environment was sober and supportive. Treatment at a lower
    > level of care appears appropriate.

    > Alcohol Alcohol. 2019 Mar 1;54(2):167-172. doi: 10.1093/alcalc/agy093.
    > Alcohol Craving Predicts Relapse After Residential Addiction Treatment
    > Matthew E Stohs 1, Terry D Schneekloth 2, Jennifer R Geske 2, Joanna M
    > Biernacka 2, Victor M Karpyak 2.

    > Replicate the previously reported association of elevated alcohol craving,
    > measured by Penn Alcohol Craving Scale (PACS) during residential treatment,
    > with post-treatment relapse and explore whether elevated craving scores 3 months
    > post-treatment are also associated with subsequent relapse.

    > Follow-up data was available for 149/190 (78%) of subjects. Elevated PACS
    > scores at discharge were associated with increased relapse risk within the first 3
    > and 12 months after discharge (P= 0.032 and P= 0.045, respectively). Elevated
    > PACS scores at 3 months were associated with increased risk of subsequent
    > relapse within 12 months after treatment in contacted subjects (P= 0.034) and in
    > the intent-to-treat analysis (P=0.0001). Our findings indicate strong association of
    > post-treatment relapse with elevated alcohol craving measured at treatment

completion and at 3 months after treatment and justify the use of this measure to guide relapse-prevention efforts.

J Subst Abuse Treat. 2019 Mar;98;53-58. doi: 10.1016/j.jsat.2018.12.009.Epub 2018 Dec 26. Factors associated with completion of alcohol detoxification in residential settings. Ryan Mutter 1, Mir M Ali 2.

Over 15 million Americans have alcohol use disorder (AUD). Detoxification often occurs before treatment and is therefore, an important component of the alcohol treatment system. Detoxification in a residential setting is indicated for certain patient populations, who often have more severe cases. This analysis examines factors associated with completion of detoxification for patients with AUD in residential facilities.
Social determinants of health were associated with detoxification completion. Patients who had a high school education or more and who were not homeless were more likely to complete detoxification. Referral from alcohol/drug care and other health care sources, school/work and community sources, and the criminal justice system had higher odds of completing detoxification. The odds of completing detoxification were lower for patients who began drinking at age 11 or younger, those with concurrent opioids, methamphetamine, or benzodiazepine abuse, and those with a co-occurring psychiatric condition. The factors this study identified as being associated with lower odds of detoxification completion could be used to identify patients who would benefit from greater support during detoxification, treatment, and continuing care.[1]

The records show that the member was medically stable during the period in review. The member was compliant and abstinent. The member did not show any symptoms suggesting that he was at risk of self-harm or of hurting others.
The member did not need to be in treatment for 24 hours a day/7 day [sic] a week and the member could have been treated at a lower level of care. Therefore, the residential treatment (06/26/2020 - 07/19/2020) was not medically necessary for this member.

63. R.R. became concerned that the external review focused only on a diagnosis of Alcohol

Use Disorder and contacted the external review organization Dane Street on April 15,

2021. Dane Street representative Tatiana informed R.R. that the external review had been

---

[1] No context or explanation is given as to why the reviewer included these studies in the middle of their review determination or how or if they apply to S.R.'s treatment. The cited material appears to show that S.R.'s treatment was denied at least in part because alcohol users who experienced post-treatment cravings were found to be more likely to relapse after treatment. The reviewer makes no effort to clarify how denying payment based on anticipated future behavior is congruent with the terms of the Plan or with generally accepted standards of medical practice.

performed taking Alcohol Use Disorder as the principal diagnosis because United had

specifically instructed Dane Street to perform the review this way.

64. Following this appeal, R.R. sent the Defendants a document titled ERISA request asking

for the documents to which he was entitled. In a letter dated May 13, 2020, United

responded to R.R.'s ERISA request by producing some of its internal notes regarding the

claim denial. It did not produce the other materials he requested.

65. In letters confirmed to be delivered to the Plan on October 4, 2021, and United on

October 5, 2021, R.R. once again requested to be provided with a copy of the materials

he was entitled to under ERISA but had not yet received. Specifically, he requested:

- A complete copy of [S.R.]'s claim file;
- Disclosure of the identities of all individuals with clinical or medical expertise who evaluated the treatment for our son, [S.R.] at True North Wilderness Programs and Ascend Recovery, copies of those individuals' *curriculum vitae*, copies of any memoranda, emails, reports, or other documents reflecting the rationale of the reviewers in denying coverage for [S.R.]'s claim;
- A complete copy of both the medical necessity criteria utilized by United HealthCare or OptumHealth Behavioral Solutions in determining that [S.R.]'s treatment was not medically necessary and that it was experimental or investigational treatment;
- A complete copy of the medical necessity criteria utilized by the Plan for skilled nursing facilities, sub-acute inpatient rehabilitation treatment, and inpatient hospice treatment. This is necessary to allow us to carry out an evaluation of whether the Plan has complied with the requirements of the federal Mental Health Parity and Addiction Equity Act;
- Complete copies of any and all internal records compiled by United HealthCare, OptumHealth Behavioral Solutions and General Dynamics Corporation in connection with [S.R.]'s claim including, but not limited to, telephone logs, memoranda, notes, emails, correspondence, or any other communications;
- A copy of the summary plan description, master plan document, certificate of insurance, insurance policy, and any other document under which [S.R.]'s insurance plan is operated;
- Copies of any and all administrative service agreements, contracts or other documents which described and defined the relationship, rights and obligations of and between you, the plan administrator, United HealthCare, OptumHealth Behavioral Solutions;
- Copies of any and all documents outlining the level of accreditation required for residential treatment programs;
- Copies of any and all documents showing whether analogous levels of care to residential treatment programs also require these levels of accreditation; and

- Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan.

66. United sent a letter dated October 27, 2021, which provided some of the requested materials which it described as:

  - Summary Plan Description (SPD)
  - Explanation of Benefits (EOB)
  - Claim Submission
  - Document Request
  - Initial Determination Letters

67. In a letter dated November 2, 2021, General Dynamics partially complied with R.R.'s request for documents. The letter described the enclosed contents as a copy of the summary plan description and "portions" of the Administrative Services Agreement. The letter further stated:

> In addition to the foregoing requests, you also request several items related to your son's claim file and the purported treatment he received at True North Wilderness Programs and Ascend Recovery. Please be advised that the Plan Administrator does not have access to this information, and is not required by ERISA to disclose such information. Furthermore, even if the Plan Administrator were able to procure this information, the Plan Administrator generally cannot provide you with your adult son's protected health information ("PHI") pursuant to the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA")

68. The portion of the Administrative Services Agreement produced by General Dynamics was only a few pages long and contained significant redactions. In one case, in the section titled Fiduciary, only a single sentence is left unredacted.

69. Neither United nor General Dynamics produced the other materials R.R. requested.

70. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

71. The denial of benefits for S.R.'s treatment was a breach of contract and caused R.R. to incur medical expenses that should have been paid by the Plan in an amount totaling over $94,000.

72. United failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of R.R.'s requests.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

73. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

74. United and the Plan failed to provide coverage for S.R.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

75. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

76. The denial letters produced by United do little to elucidate whether United conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full

and fair review" to which they are entitled. United failed to substantively respond to the issues presented in R.R.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

77. In addition, United instructed its external reviewer to evaluate the treatment in question based on a diagnosis of F10.20 Alcohol Use Disorder. Alcohol use was not in any way a significant contributor to S.R.'s residential treatment needs, and the evaluation of treatment under this metric likely contributed to the denial.

78. United and the agents of the Plan breached their fiduciary duties to S.R. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in S.R.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of S.R.'s claims.

79. The actions of United and the Plan in failing to provide coverage for S.R.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

80. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of United's fiduciary duties.

81. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

82. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

83. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

84. The medical necessity criteria used by United for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

85. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for S.R.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does United exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

86. When United and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. United and the Plan evaluated S.R.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

87. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, United's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that S.R. received. United's improper use of acute inpatient medical necessity criteria is revealed in the statements in United's denial letters such as "The member did not show any symptoms suggesting that he was at risk of self-harm or of hurting others."

88. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that S.R. received. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

89. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

90. The Defendants cannot and will not deny that use of acute care criteria, either on its

face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

91. The actions of United and the Plan requiring conditions for coverage that do not align with medically necessary standards of care for treatment of mental health and substance use disorders and in requiring accreditation above and beyond the licensing requirements for state law violate MHPAEA because the Plan does not impose similar restrictions and coverage limitations on analogous levels of care for treatment of medical and surgical conditions.

92. R.R. pointed out that S.R. received treatment at licensed treatment facilities. In spite of this, United denied S.R.'s licensed treatment by imposing additional requirements and also by declaring it as investigational. On information and belief, United does not treat licensed medical or surgical services in this manner.

93. R.R. identified other examples of United's violation of MHPAEA, including its use of the same guidelines the *Wit* court had found to violate generally accepted standards of medical practice and placing restrictions on facility type which were not equally applied to analogous medical or surgical care.

94. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and United, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and

more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

95. United and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that United and the Plan were not in compliance with MHPAEA.

96. The violations of MHPAEA by United and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

### THIRD CAUSE OF ACTION

### (Request for Statutory Penalties Under 29 U.S.C. §1132(a)(1)(A) and (c) Against General Dynamic)

97. United, acting as agent for General Dynamics, the administrator of the Plan, is obligated to provide to participants and beneficiaries of the Plan within 30 days after request, documents under which the Plan was established or operated, including but not limited to any administrative service agreements between the Plan and United, the medical necessity criteria for mental health and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facilities.

98. While Defendants partially complied with Plaintiffs' request for documents, many of the items Plaintiffs requested were either not provided, had only been provided in part, or had been provided but with heavy redactions.

99. The failure of General Dynamics and its agent United, to produce the documents under which the Plan was operated, as requested by the Plaintiffs, within 30 days of R.R.'s requests for the Plan Documents, including the most recent letter dated October 5, 2021, provides the factual and legal basis under 29 U.S.C. §1132(a)(1)(A) and (c) for this count to improper statutory penalties up to $110 per day against General Dynamics from 30 days from the date of each of these letters to the date of the production of the requested documents.

100.     In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to

U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1.     Judgment against United and the Plan in the total amount that is owed for S.R.'s

medically necessary treatment at True North and Ascend under the terms of the Plan,

plus pre and post-judgment interest to the date of payment;

2.     Appropriate equitable relief under 29 U.S.C. §1132(a)(3) against the Defendants as

outlined in Plaintiffs' Second Cause of Action;

3.     For an award of statutory penalties against General Dynamics of up to $110 a day

after the first 30 days for each instance of Defendants' failure or refusal to fulfill

their duties, to provide the Plaintiffs with the documents they had requested.

4.     Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

5.     For such further relief as the Court deems just and proper.

DATED this 26th day of May, 2022.

By _____s/ Brian S. King_____
Brian S. King
Attorney for Plaintiffs

County of Plaintiffs' Residence:
New London County, Connecticut